JAMES S. GUNN, Appellant, *v.* LACKAWANNA STEEL COMPANY, Respondent.

Fourth Department, March 14, 1917.

Master and servant — negligence — injury to blacksmith while using steam hammer — contributory negligence — assumption of risk — absence of system of inspection — defective lighting system — negligence of fellow-employees.

In an action at common law by a blacksmith against his employer for personal injuries, the complaint alleged, among other things, that the steam hammer leaked steam; that it leaked water which ran down and came in contact with the hot metal and thereby produced clouds of steam; that the dies were not properly set in; that the upper one overlapped the lower one; that the shop was inadequately lighted; that while the plaintiff held one end of a piece of steel with a pair of tongs, a blow of the hammer forced the steel out from the die causing the han-

dles of the tongs to pierce his leg; that owing to the presence of the steam and the dimness of the light, he was unable to see the position of the dies, etc. It appeared that the plaintiff was a skilled workman of long experience and had used the hammer in question for six years; that the accident occurred during the early hours of the morning, and that there were three other hammers in good condition which he could have used.

*Held,* on all the evidence, that the complaint was properly dismissed;

That there was a failure to establish negligence on the part of the defendant;

That the plaintiff voluntarily assumed the risk of the accident which under the circumstances was obvious;

That the plaintiff in turning the bar of steel up on its edge when he should have known precisely how it was to be engaged by the two dies, took the chance of its being hidden from him by the steam and was guilty of contributory negligence.

The plaintiff, in order to recover, was bound to establish a presumption at least that the cause involving negligence produced the accident.

Negligence could not be predicated upon the absence of a system of inspection, as there was no proof of the adoption of such a system elsewhere, and as the steam hammers are simple in construction and were well understood by the plaintiff.

Since there was no complaint that the electric lighting system was not properly installed, or that it was defective, or that any of the fellow-employees of the plaintiff engaged in the lighting department were incompetent, the dimness or inadequacy of the light at the time of the accident was due to the negligence, if any negligence existed, of plaintiff's fellow-employees, for which the defendant is not liable.

KRUSE, P. J., dissented.

APPEAL by the plaintiff, James S. Gunn, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Erie on the 20th day of March, 1916, upon a dismissal of the complaint by direction of the court at the close of the case.

The decision of the motion was reserved pending the submission of the case to the jury, which brought in a verdict for plaintiff in the sum of $3,000. An appeal is also taken from an order entered in said clerk's office on the 20th day of March, 1916, dismissing the complaint upon the merits and setting aside the verdict of the jury.

*Hamilton Ward,* for the appellant.

*Evan Hollister,* for the respondent.

DE ANGELIS, J.:

This action was at common law by employee against employer for personal injuries to the former due to the alleged negligence of the latter. At the close of the plaintiff's case a motion for a nonsuit was denied and an exception was taken by the defendant to such ruling. At the close of all the evidence the motion for a nonsuit was renewed and a motion was also made by the defendant for the direction of a verdict in its favor, upon which motions the decision of the court was reserved by consent and the cause was submitted to the jury. The jury gave a verdict for the plaintiff which the court set aside and then granted the motion for the nonsuit.

The plaintiff was a blacksmith employed by the defendant in its forge shop connected with its steel manufacturing plant in the city of Lackawanna, in the county of Erie. In the early hours of the morning of Thursday, February 6, 1913, while the plaintiff was engaged in the use of a steam hammer and was holding the heated end of a bar of steel between the dies of the hammer by means of tongs clutched to the cold end of the bar, as claimed by him, at a stroke of the hammer the bar and tongs were thrown back and the handles of the tongs penetrated his right leg just above the knee. In the wound thus caused blood poisoning developed and the leg was amputated above the knee.

The complaint alleged that the steam hammer leaked steam; that it leaked water which ran down and came in contact with the hot metal and thereby produced clouds of steam; that the dies were not properly set in that the upper die overlapped the lower die; that the forge shop in the locality of this steam hammer where the plaintiff was at work was inadequately lighted; that while the plaintiff held one end of a piece of hard tool steel with a pair of tongs and was subjecting the other end to the hammer, drawing the same out, a blow of the hammer forced the steel out from the die and caused the handles of the tongs to pierce the plaintiff's right leg just above the knee; that this happened without fault on the part of the plaintiff; that owing to the presence of the steam and the dimness of the light plaintiff was unable to see the position of the dies and the position of the steel and tongs; that the defendant was

negligent in failing to give plaintiff a safe place in which to work and to keep the same in safe condition, and in failing to inspect the same from time to time and to warn and instruct the plaintiff concerning the condition of the dies and to furnish the plaintiff with a suitable and safe steam hammer.

The answer admitted the accident but denied the alleged negligence of the defendant and averred that plaintiff was guilty of contributory negligence and assumed the risk of the accident that befell him.

The defendant was engaged in manufacturing steel rails, I-beams and other articles including tools and appliances from steel. In its plant was a large building or room about 250 feet in length and 70 feet in width known as the forge shop. Some parts of the defendant's plant were operated at night and the plaintiff was the night blacksmith and had two helpers. He worked in the forge shop and it was his duty to repair broken tools, appliances and machinery that awaited him when he began his night work and such as needed repairs owing to what might happen during the night, and his evidence was to the effect that when such work as that described had been finished, it was his duty, under certain general orders, to draw out steel bars such as that upon which he wrought when he was hurt. He had worked in this same shop, as night blacksmith, performing the same kind of service, for six years, had long experience in the use of steam hammers and was thoroughly informed in all the details of the mechanism and operation of steam hammers. In this forge shop besides a Bradley steam hammer, there were four steam hammers, one 700-pound hammer (at which the plaintiff was at work), one 1,150-pound hammer known as the new hammer, one 3,000-pound hammer and one seven-ton hammer. There were two legs or standards to sustain the 3,000-pound hammer and the seven-ton hammer each, but the other two were one-legged hammers. He made his own choice of the steam hammer he used and the evidence is clear that two of those steam hammers were available for use besides the one he chose to use.

The base or anvil of the 700-pound hammer, at which the plaintiff was at work, was on the ground or floor and on the

top of it was a die twelve inches long and seven inches wide. The top of this die was the surface upon which metal was placed for hammering, and was eighteen or twenty inches above the floor. This was the lower die. The upper die was fitted into a piece of steel attached to the lower end of a vertical piston rod. Both dies were made of steel, fitted in by dovetailing and fastened tight with keys. The piston operated in a steam cylinder about two feet in length in a vertical position. The stuffing box was at the bottom of the cylinder. Exhibits D and E are said to be fairly good representations of this steam hammer and to give a fairly good idea of its construction. A straight line projected up vertically from the center of the lower die would pass through the center of the upper die, the center of the piston rod, the center of the piston and the center of the cylinder. The steam raises the hammer and the exhaust can be so controlled as to permit a heavy or a light stroke of the hammer. The steam may be also applied so as to increase the stroke beyond such as would occur from the unaided fall of the hammer. We have called, what we have described as dies, dies, because they are referred to as dies in the evidence, and such designation is probably proper, but they are not dies in the sense that they make any peculiar impression upon the steel wrought upon but present simply flat, smooth surfaces, like the surfaces of a blacksmith's anvil and his hammer. The combination of the lower die and its foundation in this case might be properly described as an anvil. One of the plaintiff's two helpers, called the hammerer, operated and controlled the hammer under the direction of the plaintiff, and the other attended to the heating of the metal to be wrought. This hammer had been in use steadily for the entire period of six years before the accident, during which the plaintiff was employed nights in this forge shop. Although the plaintiff made a disingenuous attempt to show the contrary with respect to one of the three other steam hammers, he afterwards conceded, and the evidence shows conclusively, that the three other hammers were in condition for use and were idle on the night of the accident. The plaintiff, by his own choice, had been using the 700-pound hammer continuously from an hour to an hour and a half just before

the accident.  He was engaged in drawing out, that is, in reducing in size, hard steel bars of various lengths and one and three-quarters inches square to one-half an inch in thickness and three-quarters of an inch in width.  The method adopted was this: The helper having charge of the heating, heated about one-half of a bar at a time.  The blacksmith seized the cold end of one of the bars so heated with his tongs and subjected the heated end to the hammer, called drawing it out, and when he had finished work on that end, the cold end of the bar was thrust back into the fire to be treated likewise when sufficiently hot.  The tongs were about twenty-four inches long and like blacksmiths' tongs with the jaws about three and a half inches long.  The plaintiff had finished his work on three or four of these bars of steel and was engaged on another about eight inches long.  The plaintiff testified that he had secured the grip of the jaws of the tongs upon the bar of steel by placing a link or ring over the ends of the handles.  He had taken this bar with his tongs, placed the heated end under the hammer, reduced it one way, that is flattened it to seven-eighths or three-quarters of an inch in thickness, and, as he turned it between the strokes of the hammer, so that the hammer might be applied with the bar at right angles to its former position (as it was turned, it was two and a quarter inches high) the stroke of the hammer fell causing the bar and tongs to fly back and the handles of the tongs to penetrate his leg.  The plaintiff is definite in his statement that the expulsion of the bar of steel came from the stroke of the hammer immediately following the changed position of the bar, and the hammerer who worked with him on that occasion was led to corroborate the plaintiff in that statement.

It is undisputed that the bar of steel held by the tongs at the down stroke of the hammer was thrown violently toward the plaintiff and that, as a result, the handles of the tongs pierced his leg, but the questions arise whether this result was due to any negligence on the part of the defendant that has been shown, whether the plaintiff did not assume the risk of the accident and whether he did not contribute to the result by his own negligence.  We may inquire of the possible causes of injuries so concededly received by the plaintiff.

The evidence is undisputed that a bar of steel held with tongs as plaintiff held this bar might be thrown with the same result from a steam hammer in perfect condition where the light was good and there was no escaping steam or water. Such a case would fall properly under the classification of unavoidable risks inherent in the nature of the business. The experts say that an expulsion might follow if too little of the bar was put between the dies, and especially this would be so if the bar was insufficiently heated. Quite artfully the plaintiff so fashioned his testimony as to have permitted the jury to find this as the cause of the accident, coupled with the alleged obscuring of his vision owing to the inadequacy of the light and the presence of the steam. Still another possible cause might have been the permitting of the jaws of the tongs to come within the stroke of the hammer. This again needed to be coupled with the light and steam conditions claimed by the plaintiff. The plaintiff's evidence tended to show that this was not a cause of the accident because there were no marks on the jaws of the tongs.

The plaintiff's position is that he made no examination of the steam hammer that night and that he had a right to assume that it was in a safe condition, relying on the rule that it was the duty of the defendant, that is, a master's duty, and not susceptible of delegation, to give the plaintiff a reasonably safe place in which, and reasonably safe machinery and appliances with which, to perform his work that night, and to accomplish that end to have adopted and maintained a reasonably adequate system of inspection.

Let us consider the alleged inadequacy of the light and its effect upon the work that lay before the plaintiff. This forge shop was lighted by means of electricity. There is no complaint that the lighting system was not properly installed and not ordinarily adequate. There is a suggestion that the location of the electric lights could have been improved but this suggestion has no valid basis. The plaintiff's evidence does tend to show that all electric lights in the forge shop were dim that night and had been dim at other times, and sometimes had been out. The plaintiff testified that between eight and nine o'clock that night he called the office of the master

mechanic and got the clerk in that office and that he understood, by listening over the telephone, that the clerk called the electric shop and was told that a man would be sent to attend to the lights as soon as he could be gotten; that the men were out fixing. The plaintiff testified that no one came to fix the lights that he remembered, and that they were getting worse at the time of the accident. The evidence disclosed that these bars should be heated to a white heat in order to submit them to the steam hammer for the purpose of drawing them out in view of their hardness, so that an operative, in the exercise of care, would not attempt to subject them to the steam hammer in any condition other than that of white heat. The nature of the work was such that close attention to the steel bars was necessary, and it seems to us that a steam hammer could be safely operated upon these bars without any light save that furnished by the bars themselves. In any event there is nothing unusual in temporary interruptions in systems of electric lighting.

The escape of the steam and water from the steam apparatus of the steam hammer indicated no defect in the steam hammer, for the plaintiff volunteered the statement, unquestionably true, that any steam hammer will leak steam and water when the packing gets loose. The evidence of the plaintiff tended to show that the steam and water proceeded from two sources, from the stuffing box at the bottom of the cylinder, the principal source, and from what was called the steam chest at the top of the cylinder, to some extent. What came from the upper source does not appear to have been appreciable so that we shall consider solely the steam and water that are claimed to have come from the region of the stuffing box. The stuffing box is a contrivance to hold material around the piston rod where it moves in the aperture of the cylinder, to prevent the emission of steam or water from the cylinder or the entrance of air thereto. The stuffing material is pressed against the cylinder and around the piston rod by crowding the cover of the stuffing box against the material. The cover is held by means of machine bolts with long screw threads at their ends, and nuts, and is pressed up against the material or stuffing by tightening the nuts. The material used for the stuffing wears

out and needs replacing from time to time. The plaintiff claims that the stuffing box needed repacking because either the stuffing material had worn out or was insufficient in quantity and that that condition permitted the steam and water to escape, the steam to interfere with the plaintiff's vision, and the water to drop down to the heated metal and produce additional steam to interfere with his vision. The evidence of the plaintiff tends to show that there had been trouble from the escape of steam in the use of this steam hammer on occasions before the accident and that he had made a complaint of the escape of the steam on the Sunday preceding the day of the accident. It will be remembered that the accident occurred in the early hours of Thursday, February 6, 1913. The plaintiff does not claim that any promise was made to remedy the difficulty at any particular time or at all. The plaintiff testified that the steam began to escape when he first began to operate the steam hammer on the night of the accident and continued to grow worse down to the time of the accident.

The learned counsel for the appellant lays great stress upon the effect of the alleged lapping of the upper ·die over the under die an eighth of an inch and takes the position in his brief that the dies were so adjusted and fixed by the machinists and left in that condition for the plaintiff's use. Let us test the validity of this claim. It is undisputed that dies get loose when steam hammers are in operation and that the keys to hold them in place need attention from time to time. It is proper to state in this connection that the proof of the defendant to the effect that there was no trouble of this kind in the steam hammer outweighs the evidence of the plaintiff that such overlapping existed, although we must consider the case in the view that the jury were justified in finding the truth of the plaintiff's claim in that regard. There is no proof that this overlapping existed when the plaintiff began work that night upon the steam hammer and it seems to us that in the circumstances of the case such proof should have been made to charge the defendant with that alleged element of negligence. It might well have happened that this overlapping took place while the plaintiff was using the steam hammer by reason of the use of the steam hammer and for no other cause, and in

that event the defendant could not have fairly been charged
with negligence for that reason. It is true that the plaintiff
produced evidence tending to show that there was a play of a
thirty-second of an inch where the piston rod operates in the
aperture of the cylinder, caused by the wearing of the piston
rod or such aperture and that that condition tended to a
loosening of the dies to which the jury might have found such
overlapping was due. The evidence also showed that such
play of the piston rod could be easily detected by just touch-
ing it, moving it back and forth. The overlapping might have
occurred, therefore, from either of two causes, one indicating no
fault on the part of the defendant and the other indicating
negligence on the part of the defendant. In order that the
plaintiff might recover he was bound to establish a presump-
tion, at least, that the cause involving negligence produced the
accident and no such presumption was established. It should
be borne in mind that there was positive evidence on the part
of the defendant that a new piston rod had been installed in
this steam hammer only a short time before the accident.
The plaintiff met this testimony by simply stating that he
did not remember that fact. Again, the evidence produced by
the plaintiff did not tend to show whether the wear was in the
aperture in the cylinder or in the piston rod. Again, it does
not appear that any measurement was made to disclose the
extent of this alleged play. The defendant's proof was that
there was no such condition.

The claim of the plaintiff is that that portion of the steel bar
that should have been heated, and, in this case, was in fact
heated, was about five inches in length, and that the heated
portion to the extent of four inches should have been within
the dies, that is, subjected to the pounding of the hammer. With
that situation there would have been a shoulder formed by the
outside of the upper die and a like shoulder formed by the
outside of the lower die, but the lower shoulder would have
been an eighth of an inch farther from the cold end of the bar
than the upper shoulder. Assuming that the bar was suf-
ficiently heated, the evidence is that no danger could arise from
such overlapping. That situation would be safeguarded also
because the upper part of the bar would be directly under the

view of the operative so that he could guard himself from per- mitting the hammer to fall upon that portion of the bar not sufficiently heated. Assuming that the operative might care- lessly permit the bar to enter too far within the dies so as to permit hammering upon the cold steel (and this would involve no negligence of the master), an overlapping so slight would not tend, to any appreciable extent, to add to the danger of an expulsion of the bar from the die. But there is a suggestion of a conclusion, not warranted by any evidence, that because there is an overlapping like that described by some of the plaintiff's witnesses, there is attending the same a departure in the dies from the meeting of the two surfaces thereof to their full extent and a tipping of one or both so as to form the heated portion of the steel bar into the shape of a wedge, thereby giving the same a tendency to expulsion under the impact of the hammer. There is no proof that such a wedge was formed. Again testing this unverified conclusion, what is there to show that the two surfaces of the dies would not bear such relation to each other as to make the head of the wedge at the farthest point within the die, thereby creating a tendency to draw the bar within the dies rather than to expel it therefrom? Again, assuming the validity of the theory of the plaintiff, and assum- ing that the overlapping might have been the cause of an expulsion of the bar, the shoulders alleged thereby to have been created could not have affected the bar in this case because those shoulders were removed from the hammering when the bar was turned up on edge, and while there may have been shoulders created on the edges then to be exposed to the ham- mering, due to the flattening of the bar by the hammering, those shoulders would have been opposite each other and would have sloped from the hot end of the bar to the cold end of the bar and would thereby have had a tendency to draw the bar in rather than to drive it out.

There is no evidence that would justify the claim that the defendant should have had these steam hammers inspected at particular periods of time. No proof was made of the adoption of any system of inspection elsewhere. These steam hammers are simple in construction and are used by skilled mechanics familiar with every element of their construction and every

phase of their operation. Any trouble or condition needing repairs could well be left to the reports that were made from time to time by the men who operated them, as shown by the evidence. So that we do not think that negligence can be predicated in this case upon the absence of a system of inspection.

But does the evidence disclose any negligence whatever on the part of the defendant? There is no complaint that the electric lighting system was not properly installed nor that there was any defect in the system. There is no claim that any of the fellow-employees of the plaintiff engaged in the lighting department were incompetent servants. So that the dimness or inadequacy of the light on the particular occasion of the accident was due to the negligence, if any negligence existed, of the fellow-employees of the plaintiff, for which the defendant was not liable.

The evidence abundantly shows that steam hammers while in operation are subject to wear and tear, the effects of which may appear at any moment. There is no claim that the steam hammer in question was defective nor that there was anything in its construction which interfered with its reasonable use in the defendant's plant. It is undisputed that the stuffing box needed filling with new material from time to time and needed attention. It is undisputed that piston rods needed replacing from time to time. There is no claim but that the defendant had all the material for these repairs on hand. So that if the plaintiff was injured by reason of the negligence of his fellow-employees in the machine shop, it was the negligence of his fellow-servants and not chargeable to the defendant.

We now pass to a consideration of the plaintiff's alleged assumption of the risk of the accident and his alleged contributory negligence, assuming for the sake of the argument that the defendant was negligent with respect to the overlapping of the dies, the inadequacy of the light, the presence of the steam and its failure to maintain a system of inspection for the purpose of maintaining the steam hammers in a safe condition for use. As already stated, this steam hammer was simple in its construction and operation and easily understood by one of even limited capacity and experience. The plaintiff was sixty-two

years old, a skilled workman, as familiar with this steam hammer as a driver would be with a team he had driven for six years. The plaintiff had worked at his trade for forty-three years. He had worked as foreman over blacksmiths in the old car company, now the American Car and Foundry Company, for fourteen years. He had worked for the defendant as night blacksmith for six years immediately before the accident in this same forge shop. He knew how the defendant's plant was operated and the absence of a system of inspection. Although he testified that he had never packed a stuffing box, still he testified to his familiarity with the subject and with every part of the construction and operation of a steam hammer, and that he had used the steam hammer in question during the entire period of six years continuously prior to the accident. So that it was not a novice to whom there was presented that night the conditions surrounding his work. He testified that the steam and water were leaking and that the lights were dim from the very beginning of his use of this steam hammer that night. If either the piston rod or the aperture to the cylinder were so worn as to have been the cause of the play attempted to be described, the wearing had taken place under his observation. The nature of the work in which he was engaged was not such as even to suggest urgency to its performance. There were two other steam hammers in the forge room well adapted to the work he was engaged in and which he was free to use. They were near him and he had the right to choose to use them. He testified that it was his practice when he could not use any machinery in the plant to leave it and leave the work undone. He had before him at the time of the accident every condition of risk involved in his work which any one in the employment of the defendant could have known, and it seems to us that there is no answer to the proposition that he voluntarily assumed the risk of this unfortunate accident, a risk that was obvious.

Again, the plaintiff testified that he turned the bar of steel upon which he was at work up on its edge when he should have known precisely how it was to be engaged by the two dies and took the chance of its being hidden from him by the cloud of

steam he described as interfering with his vision of his work. So that it seems to us that, on his own statement, he was guilty of contributory negligence.

There is nothing in the appellant's proposition that the trial court erred in dismissing the complaint. (*Bail* v. *N. Y., N. H. & H. R. R. Co.*, 201 N. Y. 355; *Blyth* v. *Quinby & Co.*, 148 App. Div. 871.)

It follows that the judgment and order appealed from should be affirmed, with costs.

All concurred, except KRUSE, P. J., who dissented.

Judgment and order affirmed, with costs.